******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ADRIAN PEELER *v.* COMMISSIONER
OF CORRECTION
(AC 36346)

DiPentima, C. J., and Keller and Mullins, Js.

*Argued September 8—officially released November 17, 2015*

(Appeal from Superior Court, judicial district of
Tolland, Newson, J.)

*D. Wade Luckett*, assigned counsel, with whom, on
the brief, was *Walter C. Bansley IV*, assigned counsel,
for the appellant (petitioner).

*Emily D. Trudeau*, deputy assistant state's attorney,
with whom, on the brief, were *John C. Smriga*, state's
attorney, and *Craig P. Nowak*, senior assistant state's
attorney, for the appellee (respondent).

*Opinion*

KELLER, J. Following the habeas court's judgment denying his amended petition for a writ of habeas corpus, the petitioner, Adrian Peeler, appeals following the denial of his petition for certification to appeal. The petitioner claims that the court abused its discretion by denying his petition for certification to appeal on the following grounds: (1) his trial counsel rendered ineffective assistance by failing to present testimony from a particular witness; (2) at his criminal trial, the state deprived him of his right to due process by failing to preserve certain exculpatory evidence; and (3) he demonstrated his actual innocence. We dismiss the appeal.

The following facts and procedural history are relevant to the present appeal. In 2001, the petitioner was convicted, following a jury trial, of conspiracy to commit murder, for which he was sentenced to a term of incarceration of twenty years. Our Supreme Court affirmed the judgment of conviction, at which time it set forth the following facts underlying the crime: "In the 1990s, the [petitioner] and his brother, Russell Peeler (Russell), ran a large-scale drug trafficking operation in the city of Bridgeport. The [petitioner] and Russell divided the profits derived from the operation, which were estimated to be as much as $38,000 per week.

"Sometime in 1997, Russell and a former drug trafficking partner, Rudolph Snead, Jr., had a dispute, apparently over drug money. As a result of this dispute, Russell attempted to kill Snead on September 2, 1997. Specifically, on that date, Russell was riding in a car with Ryan Peeler, Corey King and Shawn Kennedy when Russell noticed Snead's car in the parking lot of a barbershop located in Bridgeport. Snead subsequently left the barbershop and drove to a gas station. Two seven year old boys, one of whom was Leroy Brown, Jr., were passengers in Snead's car.

"After Snead exited the gas station, Russell followed Snead to the Lindley Street entrance ramp to Route 25 in Bridgeport. Snead proceeded up the ramp but gradually slowed down and pulled off to the side of the road. The car in which Russell was riding pulled alongside Snead's car. Russell, who was armed with a .40 caliber, semiautomatic handgun and seated in the right front passenger seat, fired several shots at Snead. Although Snead had been injured by the shots, he was able to drive himself to St. Vincent's Medical Center in Bridgeport where he received treatment for his gunshot wounds.

"Shortly thereafter, Officer Robert Shapiro of the Bridgeport police department interviewed Snead and his two young passengers. Shapiro's investigative report included the names of all three interviewees. On the

basis of Snead's identification of Russell as the person who had shot him, Russell was arrested and charged with attempted murder.

"Russell posted bond, however, and was released from custody. While free on bond, Russell shot and killed Snead in the same barbershop that Snead had patronized immediately prior to the Lindley Street shooting. After ballistics tests performed on shell casings retrieved from the murder scene and the scene of the Lindley Street shooting revealed that they had been fired from the same gun, Russell was arrested and charged with the murder of Snead.

"Russell again secured his release by posting bond. As a condition of his release, Russell was required to be in his house on Chopsey Hill Road in Bridgeport by 9 p.m. each evening. He also was required to wear an electronic ankle bracelet so that his compliance with the court imposed curfew could be monitored.

"In January, 1998, during the course of pretrial discovery in the criminal case involving the Lindley Street shooting, the state provided Russell with a police report identifying Brown as one of the two passengers in Snead's car when the Lindley Street shooting had occurred.

"Russell did not learn, however, until December 23, 1998, that Brown and his mother, Karen Clarke, had given the police sworn, written statements about the Lindley Street shooting. In addition, after Russell was arrested for Snead's murder, the state provided Russell with copies of certain ballistics reports connecting the shell casings found at the scene of the Lindley Street shooting with the shell casings found at the scene of Snead's murder.

"During the fall of 1998, Russell frequently speculated about the identity of the state's witnesses. Upon learning that Brown's testimony linked him to the Lindley Street shooting and that the ballistics evidence connected that shooting with the murder of Snead, Russell began to speak about killing Brown and Clarke. On one such occasion, Russell and the [petitioner] had a heated discussion in which Russell repeatedly implored the [petitioner] to kill Brown and Clarke. The [petitioner] declined to do so, however.

"At this time, Russell and his drug trafficking associates were using a house located at 200 Earl Avenue in Bridgeport to process crack cocaine. The residents of that house, including Josephine Lee, were crack cocaine users who obtained their drugs from Russell and the [petitioner]'s drug operation. Brown and Clarke lived across the street, at 207 Earl Avenue.

"Lee testified that, on January 6, 1999, Russell and King were at her house, observing Clarke's house from a window in Lee's dining room. Lee further testified that the [petitioner] and Gary Garner, one of Russell's

associates, came by her house that day. King eventually left Lee's house and, thereafter, Lee observed Russell and the [petitioner] having a discussion in her living room.

"Russell and the [petitioner] then entered Lee's kitchen and prepared some crack cocaine. At that time, Russell offered Lee 'a couple hundred' dollars if she would kill Clarke. Lee, who testified that she never had handled a gun, declined to do so, however. Russell thereupon asked the [petitioner] if he would kill Clarke. According to Lee, the [petitioner] stated that he would 'take care of it.'

"Russell then asked Lee to keep an eye on Clarke's house and to contact him when Clarke and Brown arrived home. Lee agreed to do so, and Russell wrote down his beeper number for Lee so that she could reach him when Clarke and Brown returned home. Russell gave Lee some crack cocaine, apparently in return for her willingness to act as a lookout for him.

"Lee testified further that, the next day, in the late afternoon, she was at home 'getting high' when she observed Clarke pull into her driveway. Both Clarke and Brown exited the car and entered Clarke's house. Lee then called Russell's beeper number. Upon receiving the beeper message, Russell called Lee back. Lee told Russell that 'the little boy and lady [were] home.' A few minutes later, Lee entered her living room and saw the [petitioner] standing there. The [petitioner], who was dressed in black and had a gun in his hand, greeted Lee and then left Lee's house through the front door. Lee followed him.

"The [petitioner] crossed the street and walked toward Clarke's house. The [petitioner] stopped, however, to speak to Garner, who was the lone occupant of a car that was parked in front of Clarke's house. Lee testified that she heard the [petitioner] tell Garner that 'he was going in.' According to Lee, Garner then warned her that if she 'said anything,' she and the 'whole house' were 'going to get it, too.'

"The [petitioner] and Lee walked up to Clarke's front door. Lee rang the doorbell while the [petitioner] hid behind her. Lee heard Clarke, from inside the house, ask, 'Who is it?' Lee identified herself as '[t]he girl across the street.' Clarke started to open the door when the [petitioner] pushed past Lee and forced the door open.

"Lee testified that she followed the [petitioner] into Clarke's house where she observed him chase Brown and Clarke up a flight of stairs. While Brown was 'hollering out for his mommy,' the [petitioner] pursued Clarke into an upstairs bedroom. According to Lee, she heard the [petitioner] say something about Brown being a witness and then heard a gunshot from the bedroom. Lee testified that, immediately thereafter, the [petitioner] emerged from that room and shot Brown in the

head. The [petitioner] then ran out of the house. Lee initially froze, but, thereafter, she, too, fled Clarke's house. By the time she had done so, however, both the [petitioner] and the car in which Garner was sitting were gone.

"After the shootings, the [petitioner] drove to a Comfort Inn motel in Milford and checked in under a false name. He subsequently went with Kennedy and King to the mall in Stamford. The [petitioner] eventually returned to the Comfort Inn where he remained until the next morning. The next day, the [petitioner] purchased a round trip plane ticket to North Carolina under another false name. The [petitioner] was to leave for North Carolina on January 10, 1999, and was to return to Connecticut on January 16, 1999. The [petitioner] thereafter changed his departure date to January 17, 1999, and his return date to January 23, 1999. The [petitioner] never used the ticket, however, and did not exchange it or seek a refund.

"On January 14, 1999, Russell was arrested for the murders of Brown and Clarke. Soon thereafter, the Bridgeport Post ran a story about Russell's arrest that included a photograph of the [petitioner]. That same day, at the [petitioner]'s request, Kennedy drove the [petitioner] to New York City where the [petitioner] boarded a train headed for North Carolina. On January 21, 1999, members of a Federal Bureau of Investigation (FBI) fugitive task force apprehended the [petitioner] in North Carolina in connection with the murders of Brown and Clarke." (Footnotes omitted.) *State* v. *Peeler*, 267 Conn. 611, 615–20, 841 A.2d 181 (2004).

The petitioner filed a writ of habeas corpus in 2004. In June, 2013, the petitioner filed an amended petition for a writ of habeas corpus. In his amended petition, the petitioner claimed that his trial counsel rendered ineffective assistance in a variety of ways, that he was deprived of his right to a fair trial by the state's suppression of and failure to preserve certain evidence, that he was deprived of his right to a fair trial by the state's knowing use of false testimony from several witnesses, and that he was actually innocent. The respondent, the Commissioner of Correction, denied the petitioner's claims and raised the special defense of laches.[1] The court held a hearing on the amended petition on various days in 2013. On November 12, 2013, the court issued a memorandum of decision wherein it denied the amended petition.[2] On November 20, 2013, the petitioner filed a petition for certification to appeal to this court. In the context of this petition, the petitioner set forth four proposed grounds for appeal.[3] On December 3, 2013, the court denied the petition for certification to appeal. The present appeal followed that ruling by the habeas court.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate

review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling . . . [and] [r]eversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *Wilson* v. *Commissioner of Correction*, 150 Conn. App. 53, 56–57, 90 A.3d 328, cert. denied, 312 Conn. 918, 94 A.3d 641 (2014).

I

We first address the petitioner's claim that the court improperly denied his petition with regard to his claim that his trial counsel, Patrick J. Culligan and Bruce Koffsky, had rendered ineffective assistance by failing to present testimony from a particular witness, Norman Williams. We disagree.

In his amended petition for a writ of habeas corpus, the petitioner alleged that his trial counsel rendered ineffective assistance, in part, because his trial counsel failed to present testimony from Williams. The habeas court addressed this claim on its merits. In his petition seeking certification to appeal, the petitioner broadly raised the court's rejection of his claim of ineffective assistance of trial counsel as one of the grounds upon which he sought certification. See footnote 3 of this opinion.

At the habeas trial, the petitioner presented testimony from Culligan, one of his trial attorneys. Culligan testified as to his recollection that, in January, 1999, Lee lived with Williams in a residence situated across the street from the victims' residence in Bridgeport, the site of the murders. Culligan testified as to his understanding that Williams had told the police that he did not know the petitioner and that the petitioner was not present in his residence on January 6, 1999, and January 7, 1999. Culligan testified, as well, that he had followed the related criminal trial of the petitioner's brother, Russell, which took place less than one year before that of the petitioner. He testified that he did not recall with

specificity the content of Williams' testimony during that separate trial, yet later testified that, insofar as Williams had testified that the petitioner had not been present in his residence, Williams' testimony contradicted Lee's version of the events that transpired on January 6, 1999, and January 7, 1999.

Initially, Culligan testified that he did not recall why the defense did not present Williams' testimony during the petitioner's trial. Culligan testified: "I've been asking myself why wouldn't we have called him because he's obviously a significant witness for that purpose of implicating, that he couldn't identify [the petitioner] and . . . had no recollection of [the petitioner] being at his home on January 6th and 7th, and I'm sure it's information [that was] in our file from the state. And I do not have a specific memory of why we did not call Mr. Williams at [the petitioner's] trial, and . . . to try to give . . . a reason today would just be speculation completely on my part." Later, however, Culligan discussed several factors that mitigated against the defense presenting Williams' testimony. Culligan testified that "it seem[ed] to [him]" that the defense had spoken with Williams, and that "Williams had some baggage . . . that could have made him perhaps not a very reliable witness . . . ." Culligan testified that the [petitioner]'s attorneys "would not have ignored him and we didn't ignore him." Although he recognized that Williams had testified in Russell's trial that he had not observed the petitioner in his residence on the dates at issue, Culligan also observed that Williams' statements in this regard needed to be evaluated in light of the fact that, prior to the events at issue, Williams was unable to identify the petitioner.

Relevant to the issue of trial counsel's failure to present Williams' testimony, the respondent presented testimony from Koffsky, who, along with Culligan, represented the petitioner at his criminal trial. Koffsky testified that he did not believe that Williams would have been helpful to the defense, and recalled that there were several factors that would have weighed against a decision to call Williams as a witness. Specifically, Koffsky testified with regard to his recollection that Williams was "an older gentleman," "he used crack," "[h]e allowed his home to be used by the drug dealers in the neighborhood," "[he] had . . . sex with . . . Lee, and he would pay for that sex through the payment of crack." Koffsky testified that these facts were relevant to an assessment of Williams' credibility and that credibility was an important consideration in his assessment of whether to present the testimony of a witness. He stated: "[T]he last thing I want is to try to get something out of a witness and then have him implode on the stand and have my strategic rationale for calling a witness backfire."

Also, the petitioner presented testimony from Joseph

Corradino, one of the prosecutors at the criminal trials of the petitioner and his brother, Russell. Corradino testified that the criminal case against the petitioner rested on Lee's testimony because she was the sole eyewitness to the events at issue. Corradino testified that the issue of Lee's credibility was the linchpin of the case. Corradino speculated that issues surrounding Lee's credibility resulted in the petitioner's acquittal of several of the serious crimes of which he stood accused.[4] Corradino testified that the state, in prosecuting the case, contemplated which witnesses would be called by the defense and that he did not anticipate that the defense would call Williams. Corradino testified that he believed Williams "would be a terrible witness for the state" and that "[h]e'd be a disaster for anyone." According to Corradino, because of the issues surrounding Williams' credibility, calling him in an effort to undermine Lee's credibility "[c]ould have backfired." He testified that he was familiar with Williams' testimony in Russell's trial and that the evidence from that trial reflected that Williams had provided the police with inconsistent statements. Corradino testified that Williams "was damaged goods. He wasn't going to add anything to the case, and he was a seventy year old crack addict who was a terrible witness when he testified in [Russell's] case . . . ."

During the petitioner's case-in-chief before the habeas court, the petitioner offered as a full exhibit the transcript of Williams' testimony at Russell's criminal trial on May 31, 2000. Following an objection by the respondent on hearsay grounds, the petitioner's attorney offered the transcript, in the context of the petitioner's ineffective assistance of counsel claim, for the limited purpose of demonstrating what information might have been known by Culligan with regard to Williams' testimony at that earlier trial. The respondent did not object to the transcript's admission on that limited ground and, following a lengthy colloquy with counsel about the proper use of the transcript, the court admitted it "for purposes of simply showing what Attorney Culligan could have had available to him as opposed to the truth of what's in the transcript . . . ." Absent objection, the court referred to its immediately preceding statements that limited the use of the exhibit and ruled that it was admitted as "[a] full exhibit *for the purposes agreed upon* . . . ." (Emphasis added.) In relevant part, the transcript reflects Williams' testimony that he did not know the petitioner prior to the murders and that he did not recall seeing the petitioner in his residence on January 6, 1999, or January 7, 1999.

In its decision, the court, citing *Nieves* v. *Commissioner of Correction*, 51 Conn. App. 615, 622–24, 724 A.2d 508, cert. denied, 248 Conn. 905, 731 A.2d 309 (1999), rejected the claim of ineffective assistance of trial counsel on the ground that the petitioner failed to present affirmative evidence in support of his claim.

The court stated: "The petitioner . . . failed to present the testimony of . . . Norman Williams . . . at the habeas trial in support of his claim that defense counsel was ineffective for failing to have called [him] as [a] defense [witness]. . . . [T]he petitioner's failure to present evidence in support of [this claim] is fatal."

Before this court, the petitioner argues: "Norman Williams' testimony was admitted as a full exhibit in the petitioner's habeas trial. Evidence at the habeas trial demonstrated that [Russell's] trial happened before [that of the petitioner], and that [the petitioner's] trial counsel was aware that Norman Williams had given statements to police and that he had testified in [Russell's] trial. [The petitioner's] trial counsel could not remember why he did not call Norman Williams to the stand. He admitted that Norman Williams' statements from [the trial of Russell] would have contradicted Josephine Lee's testimony in [the petitioner's] criminal trial. Even [Corradino] admitted that Williams' testimony would have been harmful to the state's case." (Footnote omitted.) The petitioner argues that the court committed a "clear factual error" by finding that he had failed to present evidence of Williams' testimony. Also, the petitioner argues that the court erred as a matter of law by concluding that his "failure to physically produce Norman Williams at the habeas trial was fatal to his ineffectiveness claim." The petitioner argues that the evidence presented was sufficient to demonstrate the manner in which Williams would have testified if he had been called as a witness in the petitioner's criminal trial. Further, the petitioner argues that the evidence presented was sufficient to demonstrate that, had Williams testified at his criminal trial, such testimony would have changed the outcome of the trial.

"In order to establish an ineffective assistance of counsel claim a petitioner must meet the two-pronged test enunciated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Specifically, the claim must be supported by evidence establishing that (1) counsel's representation fell below an objective standard of reasonableness, *and* (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. . . . Because both prongs of *Strickland* must be demonstrated for the petitioner to prevail, failure to prove either prong is fatal to an ineffective assistance claim. . . . In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Atkins* v. *Commissioner of Correction*, 158 Conn. App. 669, 675, 120 A.3d

513, cert. denied, 319 Conn. 932,    A.3d    (2015).

As the foregoing authority reflects, to demonstrate that his trial counsel rendered ineffective assistance by failing to present Williams' testimony at his criminal trial, the petitioner bore the burden of demonstrating that his counsel acted deficiently by failing to present his testimony *and* that it was reasonably probable that such deficient performance affected the outcome of the trial. At the habeas trial, the petitioner did not present live testimony from Williams and did not present any other evidence to demonstrate what testimony, if any, Williams would have provided had he been called as a witness at the petitioner's criminal trial. Contrary to the petitioner's reading of the habeas court's memorandum of decision, the habeas court did not reject his claim on the specific ground that he had failed to present Williams' *live* testimony at the habeas trial or that it would consider only *live* testimony. The court faulted the petitioner for failing to present Williams' testimony *in any form*, generally stating that the petitioner had failed to present *evidence* in support of his claim.

The petitioner's argument that the court improperly required that he present Williams' live testimony is belied by events that transpired during the habeas trial that plainly reflected the court's willingness to consider a substitute for Williams' live testimony. The record reflects that, on the eve of the habeas trial, it was brought to the court's attention that Williams, who was expected to testify for the petitioner, would be unable to travel to Connecticut to testify because he was experiencing failing health. On August 7, 2013, over the respondent's objection, the court granted the petitioner's request to conduct an out-of-state deposition of Williams, who was residing in Georgia. During a lengthy colloquy concerning the issue, the court afforded the petitioner a continuance, until August 31, 2013, to depose Williams. Although the petitioner's attorney referred to his own scheduling issues and expressed his concerns about completing the deposition by August 31, 2013, he indicated to the court that he would "make every single effort to do it." The court made clear that it would permit the petitioner to present Williams' deposition testimony and, if necessary, permit the respondent "the opportunity to either recall witnesses or to present additional witnesses based on any new information or issues that they feel they need to address that comes out of Mr. Williams' testimony." The petitioner did not object to the court's ruling concerning the deposition and does not challenge that ruling in this appeal.

Furthermore, the record does not support the petitioner's argument that, by presenting in evidence at the habeas trial the transcript of Williams' testimony during the criminal trial of Russell, he thereby presented evidence relevant to the issue of how Williams would have testified, if at all, during his own criminal trial. Although

evidence of Williams' testimony at the criminal trial of Russell was relevant to the issue of whether the petitioner's trial counsel should have attempted to present Williams' testimony at the petitioner's criminal trial, such evidence did not demonstrate the manner in which Williams would have testified, if at all, during the petitioner's criminal trial if his trial counsel had called Williams to testify. Moreover, in the present appeal, the petitioner is unable to utilize the evidence of Williams' testimony to demonstrate prejudice. In argument before this court, the petitioner stated that the transcript at issue was admitted as "a full exhibit" at the habeas trial. As we stated earlier in our discussion of this claim, however, the court did not admit the transcript at issue as a full exhibit. Absent objection by the petitioner, the court admitted the transcript as an exhibit for the limited purpose of demonstrating what information was known to the petitioner's trial counsel concerning Williams' testimony at the criminal trial of Russell. When the transcript was admitted as an exhibit, the petitioner's attorney agreed with the court's statement that the transcripts were not being admitted as evidence of the truth of what was contained therein.

Thus, the petitioner correctly observes that he presented evidence of Williams' testimony at the criminal trial of Russell, but he erroneously argues before this court that such evidence properly may be considered beyond the limited purpose for which it was admitted at trial. Thus, we do not consider the evidence in an evaluation of whether any ineffective representation in this regard was *prejudicial* to the petitioner.

The petitioner failed to present any evidence to support a finding that he was prejudiced by the failure of his trial counsel to present Williams' testimony. The record reflects that the petitioner did not present Williams' live testimony, Williams' deposition testimony, or any other evidence that properly could be considered as evidence of how he would have testified at the petitioner's criminal trial. Under *Strickland*, this failure was fatal to his claim. Accordingly, we conclude that the habeas court properly exercised its discretion in denying the petition for certification with regard to this claim.

## II

Next, the petitioner claims that the court improperly denied his petition for certification to appeal with regard to his claim that, at his criminal trial, the state deprived him of his right to due process by failing to preserve certain exculpatory evidence. We disagree.

In his amended petition for a writ of habeas corpus, the petitioner alleged in relevant part that, at his criminal trial, "the state suppressed and/or failed to preserve . . . evidence that was favorable" to him, including

certain telephone company "land line phone records." Also, the petitioner alleged that "[t]he state failed [to] obtain, preserve, and/or turn over [federal Drug Enforcement Agency] phone records, logs, and matrixes." The petitioner alleged that the state's conduct violated *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *State* v. *Morales*, 232 Conn. 707, 714–15, 657 A.2d 585 (1995), as well as the United States and Connecticut constitutions.

In our earlier recitation of the facts underlying the petitioner's conviction, we referred to the telephone calls between Lee and Russell on the day of the victims' murders. In discussing the nature of the petitioner's claim concerning telephone company phone records, the court stated: "The substance of the petitioner's claim was that there were records available in 1999 from [the telephone company] that could have conclusively established whether the telephone call Josephine Lee claimed she had made from Norman Williams' house to [Russell's] beeper when the victims arrived home, as well as Russell's call back, ever existed. The testimony of . . . [Diane] Romans [a telephone company employee], supported this claim, at least to the extent that records which could have shown this information were available in the [telephone company] database in 1999. The problem, as . . . Romans testified, was that these alleged calls were made from a land line telephone number to another local number, which is information that would not show up on a customer's monthly telephone bill. Romans testified, however, that upon making a specific request via subpoena or search warrant, law enforcement agencies would have been able to obtain the records of the local telephone calls, those made without having to dial an area code, made to and from the landline telephone at Norman Williams' residence up until about one year after the calls were made.[5] In the present case, therefore, information about the telephone calls Josephine Lee testified as having occurred on January 6 and 7, 1999, would have been available upon request until about January, 2000 . . . .

"Romans testified that [the telephone company] would have purged the records in question from their system sometime around January, 2000, in the normal course of business. . . . [A] present search of records in the [telephone company] database . . . confirmed that the records do not presently exist . . . . Therefore, it is not possible to make a present determination about what information may have been contained in those records without resorting to speculation. . . . Without knowing what the records in question may have said, it is not possible to make any reasonable finding as to the probability that these records would have had any impact, let alone one favorable to the petitioner, on the ultimate verdict." (Citations omitted; footnote omitted.)

Relying on the foregoing findings, the court rejected the petitioner's claim that any conduct *by the state* in relation to the telephone company records had violated any of his rights.[6] The court stated: "With regard to the [telephone company] records, the petitioner failed to present any evidence that either the state's attorney or any of the law enforcement agencies involved in this investigation was aware that local-to-local landline telephone call information related to this case even existed, let alone that anyone subject to the *Brady* rule was actually in possession of it and [was] obligated to turn it over in response to defense counsel's discovery request. . . . Additionally . . . it is not possible to determine what, if anything, contained in the [telephone company] records would have been 'favorable' or 'material' to the defense. Therefore, the petitioner cannot, as a matter of law, establish any violation of his rights, let alone one of a constitutional nature. . . .

"The petitioner also presents an argument that the state had an obligation, sua sponte, to seek out this local-to-local telephone record information because it might, in the abstract, have held some information that may have supported the petitioner's alibi claims. Apart from the duty under the *Brady* line of cases requiring the state to turn over potentially exculpatory information in the state's possession, and even, at times, absent any request by defense counsel . . . this court is not aware of any rule, nor has the petitioner presented one, which places an obligation upon the state to conduct an affirmative investigation into a suspect's claim of innocence." (Citations omitted.)

With respect to the records described by the petitioner as federal Drug Enforcement Agency telephone records, which were admitted into evidence at the habeas trial as petitioner's exhibits 32, 33, and 34, the court stated: "The first flaw with the petitioner's claim is that he has failed to prove that the records were in fact withheld. . . . Attorney Culligan testified at the habeas trial that he believed he had seen the records contained in exhibits 32–34 during his representation of the petitioner, and Attorney Koffsky testified that, although he remembered numerous copies of telephone records, he had no independent recollection one way or the other of whether he received the specific records contained in those exhibits. Additionally, even if the petitioner could show that the records were withheld, he failed to present any testimony from a competent individual to explain the meaning of the records in exhibits 32–34. This means that the petitioner was also unable to make the necessary showing under *Brady* that the records in question were 'favorable' or 'material' to the defense."

The petitioner's present claim, related to the state's conduct with regard to the records of the telephone company and the federal Drug Enforcement Agency,

consists of two arguments. First, labeling the telephone records at issue as "exculpatory evidence," the petitioner argues that the habeas court "ignored," "disregarded," or simply did not give attention to his state constitutional claim under *State* v. *Morales*, supra, 232 Conn. 715, and *State* v. *Asherman*, 193 Conn. 695, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).[7] Second, the petitioner argues that, by means of procedural rulings, including the court's denial of his motion to open the case and its denial of his request for a continuance, the court erroneously prohibited him from presenting testimony from a witness, Gabrielle Springer, for the purpose of "establishing [his] . . . claims" related to the telephone records at issue.

The petitioner is unable to demonstrate that the court abused its discretion in denying his petition for certification to appeal with regard to the court's rulings related to the telephone records. This is because, at the time that the petitioner filed his petition for certification to appeal, he did not set forth any of the issues involved in this claim when he set forth the grounds on which he sought such certification. See footnote 3 of this opinion (setting forth petitioner's proposed grounds for appeal).[8] This court's analysis in a recent appeal from a court's denial of a petition for certification to appeal is applicable to the facts of the present claim and, thus, governs our resolution of the claim: " '[A]n appeal following the denial of a petition for certification to appeal from the judgment denying a petition for a writ of habeas corpus is not the appellate equivalent of a direct appeal from a criminal conviction. Our limited task as a reviewing court is to determine whether the habeas court abused its discretion in concluding that the petitioner's appeal is frivolous. Thus, we review whether the issues for which certification to appeal was sought are debatable among jurists of reason, a court could resolve the issues differently or the issues are adequate to deserve encouragement to proceed further. . . . Because it is impossible to review an exercise of discretion that did not occur, we are confined to reviewing only those issues which were brought to the habeas court's attention in the petition for certification to appeal.' . . . *Tutson* v. *Commissioner of Correction*, 144 Conn. App. 203, 216, 72 A.3d 1162, cert. denied, 310 Conn. 928, 78 A.3d 145 (2013). . . .

"[W]e need look no further than the petition for certification, which did not include the petitioner's . . . claim . . . . This court has previously held that 'a petitioner cannot demonstrate that a habeas court abused its discretion in denying a petition for certification to appeal on the basis of issues that were not actually raised in the petition for certification to appeal.' *Campbell* v. *Commissioner of Correction*, 132 Conn. App. 263, 267, 31 A.3d 1182 (2011); see also *Tutson* v. *Commissioner of Correction*, supra, 144 Conn. App. 216–17

('[b]ecause the petitioner did not raise the claim [that he now seeks to have us review] when asking the court to rule on his petition for certification to appeal, we cannot conclude that the court abused its discretion on that ground'); *Melendez* v. *Commissioner of Correction*, 141 Conn. App. 836, 841, 62 A.3d 629 ('[t]he court could not abuse its discretion in denying the petition for certification about matters that the petitioner never raised'), cert. denied, 310 Conn. 921, 77 A.3d 143 (2013). Accordingly, we conclude that the petitioner has failed to demonstrate that [the habeas court] abused [its] discretion in denying the petition for certification to appeal." *Moody* v. *Commissioner of Correction*, 156 Conn. App. 210, 214–15, 113 A.3d 455 (2015).

### III

Last, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal with regard to his claim that he was actually innocent of conspiracy to commit murder. We disagree.

In his amended petition for a writ of habeas corpus, the petitioner sought relief on the ground that he was actually innocent of the crime of conspiracy to commit murder. In support of this ground, the petitioner alleged that there was evidence that, at a counseling session that occurred after the petitioner's criminal trial, Lee stated that she had testified untruthfully in the prosecutions of the petitioner and his brother, Russell. Also, the petitioner alleged that Williams' testimony at the trial of Russell supported his claim of actual innocence. The court rejected the petitioner's actual innocence claim on its merits. With regard to Lee, the court observed: "[The petitioner claims] that Josephine Lee admitted during a counseling session some three and one-half years after the [petitioner's criminal] trial that she 'made the whole thing up.' . . . [T]he petitioner was not able to introduce any credible or competent evidence to establish that the comment was ever made. Additionally, even if Josephine Lee did make the statement in question, her credibility and mental health issues were not at all secrets. It was well known by all parties involved in the petitioner's criminal trial that Josephine Lee had made numerous contradictory statements regarding her knowledge of the murders. In fact, these many contradictions and retractions, as well as her credibility and mental health issues, were the focus of defense counsel's strategy at trial, during which he subjected her to cross-examination for nearly one and one-half full days." The court stated that "there was no secret about the substantive vacillations Josephine Lee's story had gone through leading up to the time of her testimony at the criminal trial."

Additionally, the court stated: "[The petitioner] bases [the actual innocence] claim on two separate bases: the comments . . . where Josephine Lee allegedly admitted that she 'made the whole thing up' at a counseling

session some three and one-half years after the trial and an allegation that Norman Williams was home all day on the day of the shooting and would say that he did not see [the petitioner] on either of those days, which would have been directly contrary to Josephine Lee's testimony. First . . . the petitioner was unable to produce any competent or credible evidence that Josephine Lee ever made such a statement. Additionally, he failed to present either Josephine Lee or Norman Williams to testify at the habeas trial in support of these allegations, which is fatal to his claims. . . . Alternatively, even if the petitioner had produced witnesses who could have testified at the habeas trial in support of these allegations, the essence of which are that Josephine Lee was not being truthful when she said she saw [the petitioner] at Norman Williams' residence, this evidence was at best only contradictory, and more than likely simply cumulative, when viewed in the light of the in-depth cross-examination of Josephine Lee by defense counsel during the criminal trial, and would have failed to meet the high standard required to prove actual innocence." (Citation omitted.)

In this appeal, the petitioner challenges the court's rejection of his actual innocence claim on the grounds that (1) the court erroneously declined to conduct an in camera review of Lee's medical records; (2) the court erroneously denied his request for a continuance so that he could present additional evidence with respect to the federal Drug Enforcement Agency telephone records, previously discussed in part II of this opinion, that had been admitted into evidence; and (3) "a substantial portion of the record" presented before the habeas court proved his actual innocence.

In accordance with the authority set forth in part II of this opinion, we observe that the only ground upon which the petitioner asked the court to consider granting his petition for certification to appeal that is arguably related to the present claim was whether the court "erred in its ruling to exclude Josephine Lee's medical records." See footnote 3 of this opinion. In determining whether the court improperly denied the petition for certification with regard to the actual innocence claim, therefore, it is appropriate that we limit our consideration to that narrow issue, as it is the only aspect of the claim upon which the habeas court was asked to exercise its discretion.

In his amended petition for a writ of habeas corpus, the petitioner alleged that, "[i]n a 2004 medical visit at the Connecticut Mental Health Center . . . three and one-half years after the conviction, Lee told a clinician, among other things, that she 'made the whole thing up' against the Peelers." (Emphasis omitted.) The petitioner relied on this allegation in his actual innocence claim. The record reflects that the petitioner subpoenaed and sought a qualified protective order from the

court with regard to records from the Connecticut Mental Health Center concerning Lee. He did so in an attempt to obtain evidence that, during treatment, she made statements to clinicians indicating that her testimony against the petitioner and his brother had been untruthful.[9]

The respondent filed an objection to the application, and the Office of the Attorney General, on behalf of the Department of Mental Health and Addiction Services, filed a motion to quash the subpoena on the ground that it sought production of confidential psychiatric records that could not be disclosed absent authorization. At the hearing related to the issue, the petitioner's attorney did not share the court's concern that it required Lee's consent even to review her psychiatric records. He represented to the court that he was unable to locate Lee and, thus, had not been able to obtain her consent to obtain the records at issue. The petitioner's attorney stated his belief that, regardless of whether Lee testified at the habeas trial, he had the right to present the records in evidence by means of a record keeper from the health center in an effort to impeach Lee's testimony at the criminal trial.

The petitioner's attorney argued that, although evidence that Lee had testified untruthfully had been presented at the criminal trial, the records were new and distinct evidence of Lee's untruthfulness, and the records at issue reflected that a clinician believed that Lee was truthful in her statements concerning her testimony. Also, the petitioner's attorney indicated that the records reflected Lee's new belief that her perjury will be exposed. The petitioner's attorney asked the court to review the records at issue to determine what portion of the records, if any, should be released to him for use at the habeas trial.

The court, setting aside any issues of the authenticity of the records on which the petitioner's attorney relied, stated that it did not believe that there was any authority under which it could review or release the records. The court stated that "the petitioner has failed to prove that he meets either the case law or any of the statutory exceptions to provide this court with the ability to order release of these [mental health] records." Contrary to the petitioner's arguments, the court concluded that disclosure was not warranted under *State* v. *Esposito*, 192 Conn. 166, 179–80, 471 A.2d 949 (1984).[10]

The court observed that the petitioner had not provided information concerning the nature of the records or the person who had authored them. Also, the court observed that the records possessed by the petitioner's counsel were not authenticated. The court observed that, even if the rule of *Esposito* applied in the context of the petitioner's habeas claim, there was no compelling reason to believe that the information at issue would bear on Lee's credibility or her ability as a witness to

tell the truth because the substance of the evidence was not new and it was generated several years following Lee's trial testimony. The court stated that the evidence of Lee's untruthfulness was "merely cumulative to information that appears to have been thoroughly exposed and thoroughly addressed on cross-examination [during the petitioner's criminal trial]." The court stated that the evidence at issue, as described by the petitioner's attorney, was merely a different reiteration of what had been presented and that no compelling basis had been presented to justify the review or disclosure of Lee's privileged records. The court, having reviewed portions of the record of the criminal trial and other submissions, observed that the evidence, that Lee had admitted that her prior statements that implicated the petitioner in the crimes were untrue, was cumulative in nature, and that the subject of such prior admissions by her had been "thoroughly and exhaustively litigated at trial." Moreover, the court observed that a claim of actual innocence in a habeas petition did not afford the petitioner an opportunity "to go on a fishing expedition or to rehash issues that frankly have already been fully litigated at trial." The court denied the application for a protective order and granted the motion to quash the subpoena.

Despite the court's rulings, during the habeas trial, the petitioner sought to admit into evidence the mental health records in the possession of the petitioner's counsel. The court excluded the evidence on the grounds that it was irrelevant, evidence of Lee having recanted her testimony could not be considered to be newly discovered, there was no proof as to the origin of the records, and the petitioner had failed to demonstrate that the privilege attached to the records should be violated.

We conclude that the court's denial of certification with respect to its ruling to exclude the records at issue or, more specifically, its failure to conduct an in camera review of such records, does not reflect an abuse of discretion. Setting aside any issues relating to the propriety of the court's observation that it lacked any authority under which to review or release the records—much less admit the records into evidence—the representations made by the petitioner's attorney as to the content of such records reflect that the records simply were an insufficient basis upon which to base a claim of actual innocence. "To prove actual innocence the petitioner must be able to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could [find] proof of guilt beyond a reasonable doubt. . . . Actual innocence, also referred to as factual innocence . . . is different than legal innocence. Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. . . . Rather, actual inno-

cence is demonstrated by affirmative proof that the petitioner did not commit the crime. . . .

"[T]he proper standard for evaluating a freestanding claim of actual innocence . . . is twofold. First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence— both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial— he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime. . . .

"Further, we note: To permit a petitioner to bring a substantial claim of actual innocence based on evidence that is not newly discovered would be inconsistent with our Supreme Court's conclusion that the standard governing a claim of actual innocence should be more demanding than the standard used for determining whether a new trial should be granted because of newly discovered evidence. . . . We view this holding as one that balances the societal interests of finality, comity, and conservation of scarce judicial resources, against the benefit of dispos[ing] of the case as law and justice require. General Statutes § 52-470 (a). Entertaining claims of actual innocence that are not based on newly discovered evidence would have a disruptive effect on the finality of judgments because it would permit a petitioner to raise allegations that, absent proof of an antecedent constitutional violation that affected the result of his criminal trial, could have been raised at the criminal trial. . . . This evidentiary burden is satisfied if a petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Citations omitted; internal quotation marks omitted.) *Nemhard* v. *Commissioner of Correction*, 157 Conn. App. 368, 374– 75, 117 A.3d 915, cert. denied, 319 Conn. 902,     A.3d (2015).

"Recantations of inculpatory criminal trial testimony undoubtedly are relevant to a determination of actual innocence. But evidence of that nature must be accompanied by *affirmative* evidence of innocence to meet [the] standard of clear and convincing evidence of actual innocence. . . .

"Affirmative proof of actual innocence is that which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no* crime actually occurred. . . . Clear and convincing proof of actual innocence does not, however, require the petitioner to establish that his or her guilt is a factual impossibility." (Citation

omitted; emphasis in original; internal quotation marks omitted.) *Jackson* v. *Commissioner of Correction*, 149 Conn. App. 681, 706–707, 89 A.3d 426, cert. granted on other grounds, 313 Conn. 901, 96 A.3d 558 (2014).

The petitioner does not challenge the court's detailed finding that, at the petitioner's criminal trial, Lee was subjected to a vigorous and lengthy cross-examination that exposed a variety of factors that tended to undermine her credibility. Significantly, the court referred to the undisputed evidence related to the petitioner's criminal trial, evidence that demonstrated that, in stark contrast to Lee's trial testimony that implicated the petitioner in the murders of Clarke and Brown, she had made several statements, including written statements, in which she denied knowing who had perpetrated the crimes, and had denied her own involvement in the crimes. Certainly, the evidence that the petitioner sought to introduce by means of Lee's medical records was not *identical* to evidence of this nature that had been presented at the time of his criminal trial, yet the evidence unmistakably tended to demonstrate the substance of what already had been amply presented at the time of the trial, that, on more than one occasion, Lee had recanted her version of relevant events, and that there was ample evidence to demonstrate that she was not a credible witness. This inherently cumulative nature of the medical records significantly decreased its value.

Furthermore, even if the records at issue could be viewed as new or compelling evidence of *recantation*, the petitioner did not accompany it with any allegations, let alone newly discovered affirmative evidence, to demonstrate his *actual innocence*. Beyond relying on the evidence of Lee's alleged recantation in the medical records, the petitioner relies on Williams' testimony at the trial of Russell, which, as we have observed previously in this opinion, was not admitted for its truth. Additionally, the petitioner relies on the testimony during the habeas trial of Corradino, which, he argues, demonstrated the importance of Lee's testimony and demonstrated that the state's case against him was weak. He also relies on the testimony during the habeas trial of his trial counsel, which, he argues, demonstrated the importance of Williams' testimony in contradicting that of Lee. Moreover, the petitioner urges us to consider evidence that was presented during his criminal trial which, in his favorable view of it, "tends to show that [he] was not involved in the murders at all."

None of this evidence, whether viewed in isolation or as a whole, properly may be considered as newly discovered affirmative evidence of his actual innocence. For the foregoing reasons, we conclude that the court properly denied the petition for certification to appeal with regard to the issues involving Lee's medical records because such records were insufficient to sup-

port a claim of actual innocence.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] The court, determining that any prejudice resulting from the petitioner's delay in bringing a petition for a writ of habeas corpus was more harmful to the petitioner than to the respondent, rejected the defense of laches and considered the petitioner's claims on their merits.

[2] On December 19, 2013, the court issued a corrected memorandum of decision. In its corrected decision, the court merely omitted a blank footnote that had appeared in its original decision of November 12, 2013.

[3] In his petition for certification to appeal, the petitioner stated that he had set forth the grounds on which he requested certification in his application for waiver of fees, costs and expenses and appointment of counsel on appeal. In that application, which he submitted with his petition for certification to appeal, the petitioner set forth four grounds on which he proposed to appeal, as follows:

"(1) Based on the facts, the judge misapplied [the] *Strickland* v. *Washington* [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] standard.

"(2) Court erred in its finding that my trial attorneys' performance wasn't deficient.

"(3) Court erred in its ruling to exclude Josephine Lee's medical records.

"(4) Court erred in its ruling to admit . . . [federal Drug Enforcement Agency] phone records only as a partial, and not [a] full, exhibit."

[4] The jury returned a not guilty verdict with regard to one count of murder and two counts of capital felony.

[5] The court went on to observe in relevant part: "Despite her testimony that this information was readily available upon request, albeit using very specific language, it is interesting to note that neither the state's attorney, an FBI special agent who amassed thousands of pages of other landline and cell phone records while leading a concurrent investigation into the drug operation being run by the petitioner and his brother, or the defense attorneys were aware that the telephone company maintained these local landline records, that they were even available for request, or that there would have been any distinction between that information and the information typically turned over upon a subpoena or warrant requesting subscriber records. In the end, it appears that the availability of these local landline records . . . was somewhat of a well-kept 'secret' of the telephone company . . . ."

[6] As part of his claim *of ineffective assistance of trial counsel*, the petitioner alleged that his trial counsel improperly had failed to present "phone record information" to (1) "[i]mpeach [telephone company] testimony that local calls were not possible to obtain," (2) "[i]mpeach Josephine Lee by showing that the initiating call from Josephine Lee to Russell . . . did not exist," (3) "[i]mpeach Josephine Lee by showing that the call from Russell . . . to Josephine Lee did not exist," (4) "[i]mpeach Josephine Lee by showing that the call from Russell . . . to [the petitioner] did not exist," (5) "[p]rovide an alibi by way of cell site locations showing that [the petitioner] was on his way home from Bridgeport to Milford at the time of the murder," (6) "[p]rovide an alibi by way of cell phone records indicating that [the petitioner] was on the phone with his girlfriend at the time of the murder," and (7) "[c]orroborate [the petitioner's] statement to the FBI."

The court rejected this claim of ineffective assistance on the ground that the petitioner had failed to present any evidence concerning the *content* of the telephone records at issue and, thus, had failed to demonstrate that he was prejudiced by counsel's conduct in relation to the telephone records. In the present appeal, the petitioner does not claim that the court improperly rejected his claim of ineffective representation related to the telephone records.

[7] Although we do not evaluate the merits of the petitioner's claim, it suffices to observe that a petitioner is unable to obtain appellate relief by demonstrating that a habeas court failed to consider a claim that was raised adequately in a petition for a writ of habeas corpus. "This court is not bound to consider claimed errors unless it appears on the record that the question was distinctly raised . . . and *was ruled upon and decided by the court adversely to the* [*petitioner's*] *claim*. . . . This court is not compelled to consider issues neither alleged in the habeas petition *nor considered at the habeas proceeding* . . . ." (Emphasis added; internal quotation marks omitted.) *Greene* v. *Commissioner of Correction*, 131 Conn. App. 820, 822, 29 A.3d 171 (2011), cert. denied, 303 Conn. 936, 36 A.3d 695 (2012).

[8] As one of the grounds set forth in his petition for certification to appeal, the petitioner stated that "[the] court erred in its ruling to admit . . . [federal Drug Enforcement Agency] phone records only as a partial, and not [a] full, exhibit." In the context of the present claim, the petitioner does not set forth a claim with respect to that ground. Instead, as we have discussed previously, he argues in the present claim on appeal that the court failed to consider his claim arising under the Connecticut constitution and that it engaged in two specific "procedural errors" that precluded him from presenting the additional evidence (in the form of Springer's testimony) that would have enabled him to demonstrate the validity of his claim relating to the federal Drug Enforcement Agency records that had been admitted in evidence. The petitioner did not alert the habeas court to the present claim because the present claim does not reasonably fall within a reasonable interpretation of the grounds presented to the court in support of the petition for certification to appeal.

[9] The petitioner's attorney represented that he had reviewed the records at issue, which he had obtained because they were part of a file that had been transferred to him from another attorney. He acknowledged that he was unable to lay a foundation to introduce the records in his possession as an exhibit, and that he "[had] no way of knowing authenticity questions about it." The court marked a copy of these records as an identification exhibit.

[10] "In *State* v. *Esposito*, supra, 192 Conn. 179–80, [our Supreme Court] set forth the following procedure for the disclosure of confidential records. If . . . the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness. If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having her testimony stricken in the event of refusal." (Internal quotation marks omitted.) *State* v. *Kemah*, 289 Conn. 411, 425–26, 957 A.2d 852 (2008).

The petitioner suggests that, despite his inability to locate Lee and the fact that she did not testify at the habeas trial, the court had the ability to admit the records. Yet, under *Esposito*, on which the petitioner relied at trial and before this court, the court was unable *to review* or *to release* the records without Lee's consent. The habeas court recognized this issue. Thus, to the extent that the petitioner focuses on the issue of the court's failure to conduct an in camera review, it is unclear what, if anything, the petitioner stood to gain by obtaining such review.